RECEIPT NUMBER

2005 22830

74 Pgo

Attach 1-3

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

THYSSENKRUPP MATERIALS N.A.,
INC., a Delaware corporation,

      Plaintiff,

v.

KYLE E. DRESBACH, an individual,

      Defendant.

```
JUDGE : Hood, Denise Page
DECK  : S. Division Civil Deck
DATE  : 03/16/2005 @ 15:32:19
CASE NUMBER : 2:05CV71033
CMP THYSSENKRUPP MATERIALS VS
KYLE DRESBACH (LE)
```

Magistrate Judge Steven D. Pepe

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.
By:    Morley Witus (P30895)
       Matthew R. Millikin (P63011)
Attorneys for Plaintiff
Barris, Sott, Denn & Driker, P.L.L.C.
211 West Fort Street, 15th Floor
Detroit, MI 48226-3281
313-965-9725

# COMPLAINT

Date: March 16, 2005

## SUMMARY OF CLAIMS

1.      From approximately 1991 through 2000, Defendant Kyle Dresbach and his co-conspirators conceived and executed a scheme to steal more than $6.5 million from Dresbach's employer, plaintiff ThyssenKrupp Materials, N.A., Inc.  Dresbach, his long-time business associate, Kenneth J. Graham, and their attorney caused plaintiff to purchase large pieces of steel processing equipment at inflated prices, and caused both plaintiff, and the suppliers of the equipment to pay exorbitant "commissions" to a middleman as kickbacks, which were subsequently laundered and used to support Dresbach's and Graham's lavish lifestyles.

2.      On August 12, 2004, a federal jury sitting in the Eastern District of Michigan unanimously convicted Graham and Dresbach of perpetrating this scheme to illegally obtain approximately $6.5 million from plaintiff.  This suit seeks to recover the funds stolen by Dresbach.

## PARTIES

3.      Plaintiff, ThyssenKrupp Materials, N.A., Inc. ("plaintiff" or "TKMNA") is a Delaware Corporation with its principal place of business in Southfield, Michigan.  TKMNA is the successor corporation to Thyssen Steel Detroit, and Thyssen, Inc.  "TKMNA" refers to plaintiff and its predecessor corporations.

4.      TKMNA supplies steel to the automotive industry, and operates steel

processing centers in Detroit, Michigan, and Richburg, South Carolina.

5.      Defendant, Kyle E. Dresbach ("defendant" or "Dresbach"), is an individual, who upon information and belief resides in Oakland County, Michigan.

6.      Prior to his retirement in or about 1996, Dresbach was TKMNA's executive vice-president.

## THE NON-PARTY CO-CONSPIRATORS

7.      Kenneth J. Graham ("Graham") was Dresbach's long-time business associate at TKMNA, where he was its Chief Executive Officer.

8.      Jerome J. Allen ("Allen") was Graham's and Dresbach's trusted confidante. Since at least 1978, Allen served as Graham's and Dresbach's personal attorney, accountant, and financial advisor.  After Graham and Dresbach were hired into leadership positions at TKMNA, they retained Allen and his law firms, Jerome J. Allen, P.C. and Allen and Defrain, P.C, as outside counsel to TKMNA.

9.      Graham and Allen were co-conspirators with Dresbach in the scheme to obtain kickbacks on the steel processing equipment purchased by TKMNA.

## HURRICANE MACHINE

10.      Hurricane Machine, Inc. ("Hurricane Machine") provided consulting services to the steel industry and was owned by Robert Murdock ("Bob Murdock").   Hurricane Machine and Bob Murdock would help to facilitate relationships between steel processors,

like TKMNA, and steel processing machinery suppliers, as well as provide technical support and repair services.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the matters stated in this complaint pursuant to 28 U.S.C. § 1331, to the extent that the allegations involve a federal question, 18 U.S.C. § 1965(a), which gives the Court jurisdiction over claims raised under the Racketeer Influenced and Corrupt Organizations Act, and 28 U.S.C. § 1367, which gives the Court supplemental jurisdiction over state law claims that are related to the federal claims involving the same case or controversy.

12.    Venue is proper in the Eastern District of Michigan because defendant resides within the District, TKMNA has its principal place of business within the District, and defendant's unlawful conduct took place within the District.

## THE KICKBACK SCHEME

13.    From in or about 1991 through in or about 2000, TKMNA embarked on a significant expansion project, building and expanding two large steel processing centers in Detroit, Michigan and Richburg, South Carolina.

14.    These facilities required overhead cranes (collectively "Cranes") to move massive coils of steel from place-to-place within the processing center, and large machines (collectively "Slitting Machines") used to cut the steel coils down into pieces according to

TKMNA's customers' specifications.

15.     In their executive positions at TKMNA, Graham and Dresbach oversaw the Detroit and Richburg expansion projects and were responsible for authorizing and approving the purchase of the Cranes and Slitting Machines.

16.     Graham and Dresbach retained Bob Murdock and his company, Hurricane Machine, to assist in the location and purchase of the Cranes and Slitting Machines. Ostensibly in exchange for Murdock's assistance, Graham and Dresbach arranged for Hurricane Machine to receive commissions from both TKMNA and from the equipment vendors on TKMNA's purchase of the Cranes and Slitting Machines.  In most cases, the commissions were calculated as a percentage of the equipment's value.

17.     Graham and Dresbach would then approve the purchase of the Cranes and Slitting Machines at inflated prices, including excess commissions to Hurricane Machine.

18.     Specifically, the purchases at issue in this case, include:

| Para | Approx Order Date | Manufacturer | Description | Vendor |
|------|-------------------|--------------|-------------|--------|
| a. | November 15, 1990 | Chicago Slitter | Maxisota II Slitting System | Chicago Slitter |
| b. | January 15, 1991 | Chicago Slitter | Slit Coil Packaging Line | Chicago Slitter |
| c. | December 3, 1991 | Zenar Corp | 4 Cranes | Rancz Equipment |

| Para | Approx Order Date | Manufacturer | Description | Vendor |
|------|-------------------|--------------|-------------|--------|
| d. | April 5, 1994 | Chicago Slitter | Maxisota II Precision Blanking System | Chicago Slitter |
| e. | April 7, 1994 | Zenar Corp | 2 Cranes and 1 Coil Grab | Ranez Equipment |
| f. | August 1, 1994 | Zenar Corp | 3 Cranes and 3 Coil Grabs | Ranez Equipment |
| g. | October 26, 1995 | Zenar Corp | 3 Cranes and 3 Coil Grabs | Ranez Equipment |
| h. | February 23, 1996 | Zenar Corp | 3 Cranes and 3 Coil Grabs | Ranez Equipment |
| i. | July 8, 1996 | Zenar Corp | 3 Cranes and 3 Coil Grabs | Ranez Equipment |
| j. | September 6, 1996 | Zenar Corp | 4 Cranes and 4 Coil Grabs | Ranez Equipment |
| k. | November 1, 1996 | Chicago Slitter | Slitting and Packaging System | Chicago Slitter |
| l. | January 22, 1997 | Zenar Corp | 4 Cranes | Ranez Equipment |
| m. | February 25, 1998 | Chicago Slitter | Maxisota II Precision Blanking System | Chicago Slitter |

19.   The total price paid for the Cranes and Slitting Machines by TKMNA was higher than TKMNA would have paid if Graham and Dresbach had been acting in the best interests of TKMNA.

20.   Further, the commissions received by Hurricane Machine were higher than

-6-

Hurricane would have received if Graham and Dresbach had been acting in the best interests of TKMNA.

21.    Graham and Dresbach then directed Allen to orchestrate the payment of a portion of the commissions received by Hurricane Machine to entities controlled by Allen as kickbacks on the Crane and Slitting Machine purchases.

22.    Allen would submit invoices to Hurricane Machine on behalf of entities that Allen controlled.  The invoices purported to seek payment from Hurricane Machine for consulting services that were in fact never performed.

23.    Hurricane Machine would then use the excess commissions it had received to pay the Allen-controlled entities for the phony consulting services.

24.    Allen would then launder the kickback proceeds through numerous bank accounts and entities that he controlled.

25.    After retaining a portion of the kickback proceeds for himself, Allen would pay the remaining proceeds to Graham and Dresbach, usually by making payments to third parties on behalf of Graham and Dresbach at their direction.

26.    The allegations in paragraphs, 13 through 24, inclusive, constitute the "Kickback Scheme."

## THE CRIMINAL CONVICTIONS

27.    On or about May 20, 2003, Allen entered into a plea agreement with the U.S.

Department of Justice in which he pleaded guilty to his involvement in the Kickback Scheme. A copy of the plea agreement is attached as App. 1.

28.    Also on or about May 20, 2003, Graham and Dresbach were indicted for their involvement in the Kickback Scheme. They were charged with money laundering, income tax evasion, and conspiracy to commit mail fraud and income tax evasion. A copy of the superceding indictment is attached as App. 2.

29.    After a two-week trial, a federal jury unanimously convicted Graham and Dresbach all counts and found that they had defrauded TKMNA of approximately $6.5 million. Copy of the jury verdict form is attached as App. 3.

### TKMNA'S DAMAGES AS A RESULT OF THE KICKBACK SCHEME

30.    Through the Kickback Scheme, Dresbach and his co-conspirators defrauded TKMNA of approximately $6,500,000 from TKMNA.

31.    In addition to the kickback proceeds, TKMNA has incurred legal fees, accounting, and personnel expenses relating to investigating the Kickback Scheme, providing interviews, witness testimony, and tens of thousands of pages of documents to the Government and to Graham and Dresbach in the criminal action.

32.    TKMNA has also been harmed by the loss of interest on the funds stolen by Dresbach and his co-conspirators and on the costs of the investigation.

**COUNT I**
**CONVERSION**

33.    Plaintiff incorporates each and every preceding paragraph by reference as if specifically set forth herein.

34.    Dresbach, acting alone and with others, intentionally and wilfully conceived and executed the Kickback Scheme, which resulted in the conversion, theft, and/or misappropriation of monies belonging to plaintiff, in the amount of at least $6,500,000 for his and his co-conspirators' own gain and benefit.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following:

a.    Compensatory, consequential and incidental damages in excess of $10,000,000;

b.    Treble damages pursuant to M.C.L. 600.2919a, or otherwise;

c.    Costs and attorneys' fees incurred as a result of defendant's conduct, including those incurred in prosecuting this action;

d.    Any and all further relief that the Court finds to be fair, just, or equitable.

**COUNT II**
**EMBEZZLEMENT**

35.    Plaintiff incorporates each and every preceding paragraph by reference as if specifically set forth herein.

-9-

36.   By engaging in the Kickback Scheme, Dresbach, while an employee and officer of TKMNA and thereafter, fraudulently disposed of or converted for his own use of the use of his co-conspirators, monies belonging to plaintiff in an amount that exceeds $6,500,000.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following:

a.   Compensatory, consequential and incidental damages in excess of $6,500,000;

b.   Costs and attorneys' fees incurred as a result of defendant's conduct, including those incurred in prosecuting this action;

c.   Any and all further relief that the Court finds to be fair, just, or equitable.

## COUNT III
## FRAUD

37.   Plaintiff incorporates each and every preceding paragraph by reference as if specifically set forth herein.

38.   Because of Dresbach's status as an employee and officer of TKMNA he had a duty to disclose numerous material facts to plaintiff, which he failed to do, including:

(a)   The existence of the Kickback Scheme;

(b)   The involvement of plaintiff's C.E.O., Graham, and attorney, Allen, in the Kickback Scheme; and

-10-

(c)     The fact that the Cranes and Slitting Machines could have been purchased by plaintiff at prices lower than were ultimately paid.

39.     Dresbach knew or should have known at the time at which he failed to disclose each of these material facts that it was material and that plaintiff would justifiably rely on his silence.

40.     Dresbach allowed these omissions to occur with the intent to defraud plaintiff.

41.     Plaintiff reasonably relied on Dresbach's silence by purchasing equipment at higher prices than they could have been purchased but for Dresbach's fraud, and by continuing to retain the services of Dresbach, Graham, and Allen.

42.     As a result of Dresbach's fraud, Plaintiff has been damaged in an amount in excess of $6,500,000 and was deprived of its intangible right to the honest services of Graham and Dresbach.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following:

a.     Compensatory, consequential and incidental damages in excess of $6,500,000;

b.     Costs and attorneys' fees incurred as a result of defendant's conduct, including those incurred in prosecuting this action;

c.     Any and all further relief that the Court finds to be fair, just, or equitable.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

43.    Plaintiff incorporates each and every preceding paragraph by reference as if specifically set forth herein.

44.    At all times relevant to this lawsuit up until his retirement Dresbach was an employee and officer of plaintiff.

45.    As an employee or officer of plaintiff, Dresbach owed plaintiff a fiduciary duty to avoid self-dealing to the detriment of plaintiff.

46.    Dresbach breached this duty by participating in the Kickback Scheme, thus placing his own interests ahead of plaintiff's interests.

47.    As a result of Drebach's breaches TKMNA has been damaged in an amount in excess of $6,500,000.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following:

a.    Compensatory, consequential and incidental damages in excess of $6,500,000;

b.    Disgorgement of salary and other compensation earned during the conduct of the Kickback Scheme;

c.    Costs and attorneys' fees incurred as a result of defendant's conduct, including those incurred in prosecuting this action;

d.    Any and all further relief that the Court finds to be fair, just, or equitable.

-12-

## COUNT V
## CONSPIRACY

48.    Plaintiff incorporates each and every preceding paragraph by reference as if specifically set forth herein.

49.    Upon information and belief, Dresbach and others (including but not limited to Graham and Allen), conspired, agreed, and acted in concert with one another to convert, embezzle, or otherwise defraud TKMNA of funds the amount of at least $6,500,000, and to deprive TKMNA of its intangible right to the honest services of Graham and Dresbach.

50.    TKMNA was harmed as a result of the conspiracy.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following:

a.    Compensatory, consequential and incidental damages in excess of $6,500,000;

b.    Costs and attorneys' fees incurred as a result of defendant's conduct, including those incurred in prosecuting this action;

c.    Any and all further relief that the Court finds to be fair, just, or equitable.

## COUNT VI
## VIOLATION OF RICO
## (18 U.S.C. § 1962(c))

51.    Plaintiff incorporates each and every preceding paragraph by reference as if specifically set forth herein.

52.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

-13-

53.    Hurricane Machine constitutes an "Enterprise," as that term is defined in 18 U.S.C. § 1961(4), and it is a corporation that, at all relevant times, has engaged in, and the activities of which have affected, interstate and foreign commerce.

54.    At all relevant times, Hurricane Machine has existed separate and apart from Dresbach's racketeering acts and his conspiracy to commit such acts.  Hurricane Machine has an ascertainable structure and purpose beyond the scope and commission of Dresbach's predicate acts, and it existed for reasons other than merely to commit the predicate acts forming the pattern of racketeering activity.

55.    Alternatively, the association-in-fact between Graham, Dresbach, Allen, and Bob Murdock (the "Hurricane Association") was an "Enterprise" as that term is defined in 18 U.S.C. § 1961(4).  The Hurricane Association existed for reasons other than merely to commit the predicate acts forming the pattern of racketeering activity.

56.    The existence and actions of Hurricane Machine and/or the Hurricane Association as an Enterprise were essential to the success of Dresbach's campaign of fraud, deceit, concealment, and misinformation.

57.    Dresbach and his co-conspirators, did unlawfully, knowingly, and intentionally conduct and participate, directly or indirectly, in the conduct, management, and operation of the affairs of Hurricane Machine and/or the Hurricane Association, which were both engaged in, and the activities of which affected, interstate and foreign commerce, though a pattern of

-14-

racketeering activity consisting of numerous acts of racketeering, indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1956, 1957 (money laundering), including, but not limited to, the acts of racketeering alleged herein in violation of 18 U.S.C. § 1962(c) over the course of nearly 10 years.

58.     Dresbach and his co-conspirators, through their control of Hurricane Machine and/or the Hurricane Association have pursued a course of conduct of deceit, misrepresentation, and conspiracy to defraud TKMNA, though the orchestration of the Kickback Scheme.

59.     As evidence of Dresbach's pattern of racketeering activity, Dresbach and his co-conspirators did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and obtain money from, TKMNA by means of material false and fraudulent pretenses, representations, and promises, and omissions of material facts, knowing that the pretenses, representations, and promises, were false when made, or omissions material, indictable under state and federal law, including without limitation, the federal mail fraud statute, 18 U.S.C. § 1341, the federal wire fraud statute 18 U.S.C. § 1343, and the federal money laundering statutes, 18 U.S.C. §§ 1956, 1957.

60.     Defendant violated the federal mail fraud, wire fraud, and money laundering statutes by participating in the Kickback Scheme, with specific intent to defraud TKMNA, by:

-15-

a.      Arranging for the solicitation and negotiation of quotations for the supply of Cranes and Slitting Machines, which were transmitted to or from TKMNA through the mails or by facsimile.

b.      Placing or receiving telephone calls to or from suppliers of Cranes and Slitting machines or telephone calls to or from the other Kickback Scheme co-conspirators.

c.      Causing checks from TKMNA, the suppliers of Cranes and Slitting machines, or other Kickback Scheme co-conspirators to be negotiated through the Federal Reserve system.

d.      Causing Allen to deposit the kickback proceeds into numerous bank accounts insured by the Federal Deposit Insurance Corporation for the purpose of concealing the ownership, control, and nature of the kickback proceeds.

61.      Illustrative examples of the use of the wires or mails for the purpose of executing the Kickback Scheme include, without limitation:

|  | Date | Description |
|---|---|---|
| a. | 1/7/94 | Purchase order for Cranes from Ranez Equipment Sales, Inc. to Zenar Corporation sent via facsimile. |
| b. | 1/8/94 | Purchase order for Cranes from Ranez Equipment Sales, Inc. to Zenar Corporation sent via facsimile. |
| c. | 5/4/94 | Check no. 20309704 from Thyssen Steel Co to Ranez Equipment Sales, Inc. for crane purchase, negotiated |

-16-

through the Federal Reserve System.

d.   3/31/95   Letter from Bob Murdock to Kyle E. Dresbach sent via U.S. Mail regarding commission payment on crane purchases.

e.   7/31/96   Letter from Bob Murdock to Kyle Dresbach sent via U.S. Mail regarding commission payment from on crane purchase.

f.   8/23/96   Check no. 50057045 from Thyssen, Inc. to Hurricane Machine for commission payment on crane purchase, negotiated through the Federal Reserve System.

g.   8/31/96   Letter from Bob Murdock sent via U.S. Mail to Kyle Dresbach regarding commission payment on slitting equipment.

h.   10/8/96   Check no. 5006008 from Thyssen, Inc. to Hurricane Machine for commission payment on slitting equipment, negotiated through the Federal Reserve System.

i.   1/22/97   Purchase order no. 6392 from Thyssen Steel Group sent via U.S. Mail to Ranez Equipment Sales, Inc. for crane purchase.

j.   1/28/97   Invoice from Zenar Corporation sent vial U.S. Mail to Ranez Equipment Sales, Inc. for crane purchase.

k.   2/18/97   Check no. 50069054 from Thyssen, Inc. to Ranez Equipment Sales, Inc. for crane purchase, negotiated through the Federal Reserve System.

l.   3/31/97   Letter sent via U.S. Mail from Bob Murdock to Hans-Christoph Machner regarding commission payment on crane purchase.

m.   6/15/97   Letter sent via U.S. Mail from Bob Murdock to Hans-

|     |         | Christoph Machner regarding commission payment on crane purchase. |
| --- | ------- | --- |
| n.  | 6/25/97 | Check no. 50077562 from Thyssen Inc., to Hurricane Machine Inc. for commission payment, negotiated through the Federal Reserve System. |
| o.  | 1/20/98 | Letter from Bob Murdock sent via U.S. Mail to Hans-Cristoph Machner regarding commission payment on slitting equipment. |
| p.  | 1/28/98 | Check no. 50090822 from Thyssen, Inc. to Hurricane Machine, negotiated through the Federal Reserve System. |
| q.  | 2/25/98 | Purchase Order no. 6809 sent from TKMNA to Chicago Slitter via facsimile. |
| r.  | 2/26/98 | Facsimile from Thyssen Steel Group to Chicago Slitter regarding revisions to purchase order no. 6809 for the purchase of Slitting Equipment. |
| s.  | 3/27/98 | Check no. 50094660 from Thyssen, Inc to Chicago Slitter for purchase of slitting equipment, negotiated through the Federal Reserve System. |
| t.  | 4/29/99 | Purchase order no. 7005 sent from Thyssen Steel Group to Chicago Slitter via facsimile |
| u.  | 9/2/99  | Check no. 50129434 from Thyssen, Inc. to Chicago Slitter for purchase of slitting equipment, negotiated through the Federal Reserve System. |
| v.  | 5/23/00 | Check no. 007103 from ThyssenKrupp Steel North America, Inc. To Chicago Slitter for purchase of slitting equipment, negotiated through the Federal Reserve System. |

-18-

62.     Illustrative examples of money laundering for the purpose of executing the Kickback Scheme, include, without limitation:

a.     Dresbach's violation of 18 U.S.C. § 1956 by conspiring with Graham and Allen to engage in financial transactions that involved the kickback proceeds, which were illegally obtained through mail fraud, in violation of 18 U.S.C. § 1341, knowing that the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds, as alleged in Count II of the Superceding Indictment.  (App. 2, pp. 9-10).

b.     Dresbach's violation of 18 U.S.C. § 1957 by engaging in a monetary transaction involving a financial institution, to use a portion of the illegally obtained kickback proceeds to pay $25,000 to Kennico Construction for improvements made to Dresbach's home at 4659 Linwood Street, West Bloomfield, Michigan, as alleged in Count III of the Superceding Indictment (App. 2, p. 10).

c.     Dresbach's violation of 18 U.S.C. § 1957 by engaging in a monetary transaction involving a financial institution, to use a portion of the illegally obtained kickback proceeds to pay $29,500 to Kennico Construction for improvements made to Dresbach's home at 4659 Linwood Street, West Bloomfield, Michigan, as alleged in Count IV of the Superceding Indictment

-19-

(App. 2, p. 11).

63.    On August 12, 2004, a federal jury returned a guilty verdict against Dresbach finding that he in fact committed the acts identified in Paragraphs 61 a-c beyond a reasonable doubt.

64.    The predicate acts and the wrongful conduct alleged in this Complaint were related in purpose in that they were all directed and intended to defraud TKMNA, and to conceal the Kickback Scheme and the source of the kickback proceeds.  They have had the same results – TKMNA was defrauded and its assets converted.  They involve the same participants – Graham, Dresbach, and Allen.  They involved the same victim – TKMNA.  They involved the same methods of commission, and they are otherwise interrelated by distinguishing characteristics and are not isolated events.

65.    The Kickback Scheme occurred regularly and continuously from in or about 1991 through 2000 and would have continued, perhaps indefinitely, had the scheme not been uncovered.

66.    Dresbach had a specific intent to deceive TKMNA.  This intention is clearly demonstrated by the complexity of the Kickback Scheme itself, including but not limited to Dresbach and his co-conspirators' (a) substantial efforts to maintain secrecy; (b) the use of Allen and the entities that he controlled to launder the kickback proceeds; (c) the payment of kickback proceeds to third parties on behalf of Dresbach, rather than payments directly to

-20-

Dresbach himself.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following damages:

    a.    Compensatory, consequential, and incidental damages in excess of $6,500,000;

    b.    Treble damages as provided for in 18 U.S.C. § 1964(c) or otherwise.

    c.    Interest, costs, and reasonable attorneys' fees as provided in 18 U.S.C. § 1964(c) or otherwise;

    d.    Disgorgement and restitution;

    e.    Any and all other relief that the Court finds to be fair, just, or equitable.

## COUNT VIII
## CONSPIRACY TO VIOLATE RICO
## (18 U.S.C. § 1962(d))

67.    Plaintiff incorporates each and every preceding paragraph as if fully set forth herein.

68.    From in or about 1991 through in or about 2000, Dresbach, Graham, Allen, and others did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree together with each other, and with others to conduct and participate, directly or indirectly, in the conduct of the affairs of Hurricane Machine and/or the Hurricane Association as an Enterprise, which was engaged in, and the activities of which affected, interstate and foreign

-21-

commerce, though a pattern of racketeering activity consisting of multiple acts indictable under federal or state law, including, without limitation, 18 U.S.C. §§ 1341, 1343, 1956, and 1957 in violation of 18 U.S.C. § 1962(d).

69.     Dresbach and his co-conspirators agreed that multiple acts of racketeering would be committed by at least one member of the conspiracy in furtherance of the conspiracy and in the conduct of Hurricane Machine and/or the Hurricane Association as an Enterprise.   It was part of the conspiracy that Dresbach and his co-conspirators would commit numerous acts of racketeering activity in the conduct of the affairs of Hurricane Machine as an Enterprise, including but not limited to, the acts of racketeering set forth above.

70.     The object of the conspiracy was for Dresbach and his co-conspirators to profit improperly from TKMNA by committing wrongful acts including fraud and money laundering.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Dresbach and award the following damages:

      a.     Compensatory, consequential, and incidental damages in excess of $6,500,000;

      b.     Treble damages as provided for in 18 U.S.C. § 1964(c) or otherwise.

      c.     Interest, costs, and reasonable attorneys' fees as provided in 18 U.S.C.

§ 1964(c) or otherwise;

d.     Disgorgement and restitution;

e.     Any and all other relief that the Court finds to be fair, just, or equitable.

Respectfully Submitted,

Barris, Sott, Denn & Driker, P.L.L.C.

By:_____
       Morley Witus  (P30895)
       Matthew R. Millikin (P63011)
Attorneys for Plaintiff
211 West Fort Street, 15th Floor
Detroit, MI 48226-3281
313-965-9725

Dated:  March 16, 2005

## DEMAND FOR JURY TRIAL

Plaintiff, by its attorneys, Barris, Sott, Denn & Driker, P.L.L.C., hereby demands a

trial by jury of all issues so triable in connection with the above-referenced matter.

Respectfully submitted,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By: _____

Morley Witus  (P30895)
Matthew R. Millikin (P63011)
**Attorneys for Plaintiff**
211 West Fort Street, 15th Floor
Detroit, MI 48226-3281
313-965-9725

Dated: March 16, 2005

g:\docsopen\mmillikin\l-cmp\0289804.02

-24-



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

JEROME JAY ALLEN,

              Defendant.

CRIMINAL NO. 03 - 90014

HON.
JUDGE MARIANNE O. BATTANI
VIOLATION: 18 U.S.C. § 371

MAGISTRATE JUDGE PEPE
OFFENSE: CONSPIRACY

STATUTORY MAXIMUM
INCARCERATION: 5 YEARS

STATUTORY MAXIMUM FINE:
$250,000

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the defendant, the attorney for the defendant, and the government[1] agree as follows:

1.    <u>Guilty Plea</u>

    A.    Defendant shall enter a plea of guilty to a one-count information, which charges him with a dual-object conspiracy to commit mail fraud and file false tax returns with the Internal Revenue Service, in violation of 18 U.S.C. § 371. If defendant fully complies with the understandings specified in this agreement, defendant will not be further prosecuted criminally by the United States Attorney for the Eastern District of Michigan and the U.S. Department of Justice, Tax Division for crimes committed prior to

---

[1]The word "government" in this agreement refers to the United States Attorney for the Eastern District of Michigan and the U.S. Department of Justice, Tax Division.



the date of this agreement arising from: (a) the submission of fraudulently inflated invoices to Thyssen, Inc.; (b) the payment of kickbacks to executives at Thyssen, Inc., and their failure to report the kickbacks as income on their federal tax returns; (c) the laundering of the proceeds of the kickback scheme through bank accounts controlled by defendant; and (d) defendant's failure to report as income on his federal income tax returns all of the income he received from his participation in the kickback scheme.

        B.     Elements

The elements of the offense are:

Conspiracy

(1)     that two or more persons conspired, or agreed, to commit the crimes of mail fraud and filing false tax returns;

(2)     that the defendant knowingly and voluntarily joined the conspiracy;

(3)     that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

Mail Fraud

(1)     devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts);

(2)     involving the use of the mails;

(3)     for the purpose of executing the scheme or attempting to do so.

Filing False Tax Returns

(1)     that a tax return was subscribed and filed with the IRS;

(2)     that the return contained a written declaration that it was made under penalty of perjury;

- 2 -

(3)    that the person signing the return did not believe the return to be true and

correct as to every material matter;

(4)    that the person acted willfully.

C.    Factual Basis

The parties stipulate that had the case proceeded to trial the government was

prepared to prove the following beyond a reasonable doubt:

Defendant is an attorney licensed to practice in the State of Michigan.  From

1991 through 2001, defendant participated in a multi-million dollar kickback scheme

with two senior executives of Thyssen, Inc., N.A. ("Thyssen"), a corporation engaged in

the business of providing steel to the automotive industry in Detroit, Michigan.  During

the relevant years, Thyssen expanded its operations by constructing various steel

processing facilities.  In connection with these construction projects, multi-million dollar

cranes and slitting machines were installed.

Sometime around January 1991, the two Thyssen executives devised a scheme

to defraud Thyssen by causing Thyssen to enter into contracts with third-party vendors

("the third-party vendors")  to purchase multi-million dollar cranes and slitting machines

at fraudulently inflated prices.  As a result of the scheme, Thyssen paid higher prices for

the cranes and slitting machines than it would have if the two Thyssen executives had

aggressively and honestly solicited competitive prices from other vendors.  With respect

to the cranes that Thyssen purchased, the contract prices were routinely inflated by

over 40%.

Sometime around January 1991, the two Thyssen executives approached

defendant and told him there was an opportunity for him to make some money.  The

- 3 -

executives explained that the owner of Hurricane Machine, Inc. ("Hurricane Machine"),
which Thyssen had hired to oversee the installation of the cranes and slitting machines,
was willing to pay "commissions" to the two executives. However, the owner was not
willing to pay cash, and would only pay with a check. In addition, the owner said that he
would not make any payments without first receiving an invoice for his files. The
executives also told defendant that they were concerned that Thyssen might find out
about the payments and that they did not want to report the payments on their tax
returns.

Defendant told the executives that he was willing to participate in the scheme in
exchange for a portion of the payments. Defendant and the executives agreed to split
the proceeds of the scheme in fixed percentages, with John Doe-1 entitled to receive
45%, John Doe-2 entitled to receive 40%, and defendant entitled to receive 15%.
However, defendant retained 50% of the two corporate executive's proceeds to pay
taxes on the money as he laundered it through his various business entities. This
brought defendant's share of the proceeds up to 57.5%. Consequently, John Doe-1
and John Doe-2 received net distributions of 22.5% and 20%, respectively.

In exchange for his share of the payments, defendant agreed to launder the
proceeds of the scheme through various bank accounts he controlled, including client
trust accounts maintained by his law firm. Defendant also agreed to prepare false
individual income tax returns for the two executives that did not report any of the
payments as income.

The use of the mails was an integral part of the scheme because Thyssen was
required to make progress payments to the third-party vendors as the cranes and

- 4 -

slitting machines were being manufactured and installed. The third-party vendors sent invoices through the mails to Thyssen seeking these payments. Thyssen, in turn, paid the invoices by sending checks through the mails to the third-party vendors. Upon receipt of the checks from Thyssen, the third-party vendors paid a 30% "commission" to Hurricane Machine via checks sent through the mails.

Thyssen also paid "commissions" to Hurricane Machine on the same equipment that the third-party vendors were paying "commissions" on. During the years 1991 through 2000, Hurricane Machine received approximately $9.3 million in "commission" payments from the third-party vendors and Thyssen. Hurricane Machine retained approximately $2.7 million of the funds as payment for legitimate work it had performed consulting on the construction projects and installing the cranes and slitting machines. Hurricane Machine used the balance of the funds, approximately $6.6 million, to make kickback payments to defendant or entities that defendant controlled or had an interest in. To conceal the nature and existence of the kickback scheme, the payments from Hurricane to defendant were disguised as "consulting services." However, defendant never provided consulting services to Hurricane Machine.

Defendant used various bank accounts, both business and personal, including client trust accounts maintained by his law firms, to launder the kickbacks for the two Thyssen executives and pay their personal expenses. During 1996, 1997 and 1998, defendant disbursed more than $1.2 million from bank accounts he controlled to pay various personal expenses of the two corporate executives. For these same years, defendant prepared U.S. Individual Income Tax Returns, Forms 1040, for the executives that failed to report any of the kickbacks as income.

- 5 -

2.   Sentence

A.   Sentencing Guidelines Worksheets

The worksheets attached to this agreement represent the joint position of the parties on the factors to be considered in calculating the appropriate sentence range under the sentencing guidelines promulgated under 28 U.S.C. §994(a).  The fraud and tax losses in the sentencing guidelines worksheets include as relevant conduct the entire losses for the years 1991 through 2000.  If defendant has provided false information that affects the calculation of the appropriate adjusted offense level, or if the government becomes aware, prior to the imposition of sentence, that defendant's criminal history is more serious than appears on the attached worksheets, the government has the option of withdrawing from this agreement.  Defendant agrees that any delay resulting from such withdrawal shall be excludable delay for purposes of the Speedy Trial Act.

The parties acknowledge that the court will independently determine the applicable sentencing factors at sentencing and that the court's determination will affect the sentence range under the sentencing guidelines.  The parties agree that all sentencing guidelines provisions that would affect defendant's guideline range have been identified in this agreement (which includes the attached worksheets), and that the parties will raise no others.

The government reserves the right to defend any of the court's rulings and findings with respect to any sentencing issue on appeal or in any collateral proceeding, notwithstanding the other terms of this agreement.  Defendant will seek a downward departure only if the grounds are identified in the attached worksheets or elsewhere in

- 6 -

this agreement, or if the grounds did not exist prior to defendant's guilty plea. The government reserves the right to oppose any such downward departure.

      B.    Acceptance of Responsibility

Based on the present circumstances, the government recommends that defendant be granted a reduction of three levels in the combined adjusted offense level, under Section 3E1.1(a) of the sentencing guidelines, because defendant has accepted responsibility for the offense as demonstrated by pleading guilty. The government reserves the right to withdraw this recommendation if new facts come to light that indicate that defendant has not accepted responsibility within the meaning of the Sentencing Guidelines.

      C.    Sentence Agreement

Pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure, the parties agree that any sentence of incarceration shall not exceed sixty (60) months, which is the maximum sentence that can be imposed for a violation of 18 U.S.C. § 371. Unless the court determines that defendant will not reasonably be able to pay a fine, or that paying a fine will unduly burden any of defendant's dependents, a fine shall be imposed. There is no agreement between the parties as to the amount of the fine. The court may also order defendant to pay the costs of imprisonment, probation, and supervised release. The court may accept or reject this agreement, or may defer its decision until it has an opportunity to consider the presentence report. Defendant agrees that the court may inspect the presentence report before it accepts or rejects the plea agreement. If the court rejects this agreement, it shall afford defendant the opportunity to withdraw the plea of guilty and advise defendant that if the plea is not

-7-

withdrawn the sentence may be greater than the maximum provided for in this agreement.

### D.    Nonapplicability of Sentence Agreement

Any limitations on the sentence that are contained in this agreement will not apply if a court rules that defendant has violated any condition of supervised release that is imposed.

### E.    Supervised Release

If defendant is sentenced to one year in prison, or less, the court may also order that, following release from prison, defendant be placed on supervised release for up to one year. If defendant is sentenced to imprisonment for more than one year, the court shall order a term of supervised release, following release from prison, of at least two years but not more than three years.

### F.    Supervised Release Violations

The term of supervised release to which defendant is sentenced will be a specific (i.e., a determinate) term chosen by the court at sentencing. The combination of prison time and supervised release is permitted, by law, to exceed the maximum term of incarceration allowed under the statute under which defendant is pleading guilty. Violation of any condition of supervised release may result in defendant's being imprisoned for the entire term of supervised release or being prosecuted for contempt of court under 18 U.S.C. § 401(3).

### G.    Special Assessment

Defendant will pay a special assessment of $100.00 in addition to any fine imposed. This assessment will be paid by defendant before sentence is imposed, and

defendant will furnish a receipt at sentencing.  Payment is to be made to the United

States District Court Clerk's Office, Room 5005, Federal Building and United States

Courthouse, Detroit, Michigan 48226

      H.    Payment of Tax and Filing of Tax Returns

      Prior to sentencing, defendant will file true and correct tax returns, Forms 1040,

for the years 1996, 1997, 1998, 1999 and 2000 with the Internal Revenue Service

reporting all his income.  As a condition of and at least 90 days prior to the expiration of

any term of  supervised release imposed herein, defendant shall in good faith

cooperate fully with the Internal Revenue Service in determining defendant's corrected

tax liability and any assessed penalties and applicable interest owed thereon and shall

make satisfactory payment arrangements for any taxes, penalties and interest with the

Internal Revenue Service.  In addition, defendant shall cooperate fully with the Internal

Revenue Service in determining the corrected tax liability of the Thyssen executives for

whom he prepared individual income tax returns.

      3.    Waiver of Indictment

      Defendant understands that he has the right to have charges filed by indictment

returned by a vote of a grand jury and agrees that he will waive his right to prosecution

by indictment in open court at or prior to his arraignment on the charges to be filed

pursuant to this agreement.

      4.    Cooperation

      A.    Truthful Information and Assistance.  Defendant promises to

provide truthful and complete information to the United States Attorney's office, the U.S.

Department of Justice, Tax Division and to other law enforcement agencies, including a

- 9 -

full debriefing and truthful testimony at all proceedings, criminal, civil, or administrative, including, but not limited to, grand jury proceedings, trials, and pretrial and post-trial proceedings, in any judicial district within the United States. Defendant agrees to cooperate in good faith, meaning that defendant will not only respond truthfully and completely to all questions asked, but will also volunteer all information that is reasonably related to the subjects discussed in the debriefing. In other words, defendant may not omit facts about crimes, participants, or his or her involvement, and then claim not to have breached the agreement because he or she was not specifically asked questions about those crimes, participants, or involvement. Any actions or statements inconsistent with continued cooperation under this agreement, including but not limited to, criminal activity or a statement indicating a refusal to testify, constitutes a breach of this agreement. Defendant agrees to be available for interviews in preparation of all testimony. Defendant further agrees to submit, upon request, to government-administered polygraph examinations to verify defendant's full and truthful cooperation.

       B.    Substantial Assistance Determination. Upon the government's determination that defendant's cooperation amounts to substantial assistance in the investigation or prosecution of others, the government will request the court to depart downward from the applicable sentencing range. The government reserves the right to make the sole determination as to whether and when defendant has provided substantial assistance. Unless expressly stated to the contrary, any such motion will be limited to a departure authorized by section 5K1.1 of the Sentencing Guidelines (which permits a departure only from the applicable guideline range); the motion will not be

- 10 -

made pursuant to 18 U.S.C. § 3553(e) (which is the authority for departure from a statutory mandatory minimum). The court's failure to follow such a recommendation, if made, is not a valid basis for defendant to withdraw the guilty plea or to rescind the plea agreement.

        C.    Use of Information Against Defendant. In exchange for defendant's agreement to cooperate with the government, as outlined above, the government agrees not to use new information that defendant provides (pursuant to this agreement) about defendant's own criminal conduct against defendant at sentencing in this case. Such information may be revealed to the court but may not be used against defendant in determining defendant's sentence range, choosing a sentence within the range, or departing from the range. There shall be no such restrictions on the use of information: (1) previously known to law enforcement agencies; (2) revealed to law enforcement agencies by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; or (4) in the event there is a breach of this agreement.

    5.    Consequences of Violating Agreement.

        A.    Government's Options. If defendant fails to keep any promise in this agreement (including any promise to cooperate), the government is relieved of any obligation not to prosecute defendant on other charges, including any charges dismissed as part of this plea agreement. Such charges may be brought without prior notice. In addition, if defendant breaches this agreement (including a promise to cooperate), the government may use against defendant in a criminal action any information that defendant has provided to the government, including the information

provided pursuant to a proffer agreement dated September 18, 2002. Furthermore, if the government determines after sentence is imposed under this agreement that defendant's breach of the agreement warrants further prosecution, the government will have the choice between letting the conviction(s) under this plea agreement stand or vacating such conviction(s) so that such charge(s) may be reprosecuted as well. If the government makes its determination before sentencing, it may withdraw from the plea agreement in its entirety.

B.    Waiver of Rights.  Defendant agrees that if defendant fails to keep any promise made in this agreement defendant gives up:

(1)  the right not to be placed twice in jeopardy for the offense(s) to which defendant entered a plea of guilty or which were dismissed under this agreement;

(2)  any right under the Constitution and laws of the United States to be charged or tried in a more speedy manner for any charge that is brought as a result of defendant's failure to keep this agreement;

(3)  the right to be charged within the applicable statute of limitations period for any charge that is brought as a result of defendant's failure to keep this agreement, and on which the statute of limitations expired after defendant entered into this agreement.

6.    Recommendations and Requests

Defendant understands that the Court is not bound to follow any recommendation or request by the government identified in this plea agreement. Further, defendant understands that if the Court refuses to follow such a

- 12 -

recommendation or request, defendant will not be given the opportunity to withdraw the plea of guilty.

7.     <u>Defendant's Waiver of Appeal Rights</u>

If the court imposes a sentence equal to or less than the maximum sentence described in paragraph 2 of this agreement, defendant waives any right he may have to appeal his conviction or sentence, including any right under 18 U.S.C. § 3742 to appeal on the grounds that the sentence was imposed as a result of an incorrect application of the sentencing guidelines.

8.     <u>No Other Terms</u>

This agreement incorporates the complete understanding between the parties, and no other promises have been made by the government to defendant or to the attorney for defendant. This agreement does not prevent any governmental agency from pursuing civil or administrative actions against defendant or any property. Unless an exception to this paragraph is explicitly set forth elsewhere in this document, this agreement does not bind or obligate governmental entities other than the United States Attorney's Office for the Eastern District of Michigan and the U.S. Department of Justice, Tax Division.

9.     <u>Effect of Conviction on Right to Possess a Firearm</u>

Defendant acknowledges and understands that a conviction for an offense that is a felony or carries a statutory maximum potential punishment of imprisonment in excess of one year (regardless of whether the actual sentence received is in excess of one year) makes it illegal under some circumstances for a person to possess or receive a firearm or ammunition that has been shipped in or affects commerce.

- 13 -

10.    Tolling of the Statute of Limitations

Defendant agrees that if defendant does not comply with the terms of this plea agreement; if the Court does not accept defendant's guilty plea; or if the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, any charges that are not time-barred by the applicable statute of limitations on the date this agreement is signed by defendant may be commenced against him, notwithstanding the expiration of the limitations period after defendant signs the agreement.

11.    Approval

This plea offer is explicitly conditioned on approval by the Chief, Northern Criminal Enforcement Section, Tax Division, U.S. Department of Justice.

JEFFREY COLLINS
United States Attorney

Dated: _5/20/03_

Alan Gershel
Chief Assistant U.S. Attorney

Dated: _5/20/03_

John E. Sullivan
Trial Attorney
U.S. Department of Justice

Dated: _5/16/03._

Jerome J. Allen, Defendant

Dated: _5/19/03_

David DuMouchel, Esquire
Attorney for Defendant

- 14 -

## WORKSHEET A   (Offense Levels)

Defendant: _____Jerome J. Allen_____          Count(s): ___One - Dual Object Conspiracy___

Docket No.: _____          Statute(s): ___18 U.S.C. § 371___

Complete one Worksheet A for each count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction) before applying the multiple-count rules in U.S.S.G. ch. 3, pt. D. However, in any case involving multiple counts of conviction, if the counts of conviction are all "closely related" to each other within the meaning of U.S.S.G. § 3D1.2(d), complete only a single Worksheet A.

1.    **BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS** (U.S.S.G. ch. 2)

| Guideline Section | Description | Levels |
|---|---|---|
| § 2F1.1(a)(1) | Conspiracy to Commit Mail Fraud   (Mail Fraud Object) | 6 |
| § 2F4.1(b)(1) | Total Loss between $5,000,000 and $10,000,000 (Including Relevant Conduct) | 14 |
| | | |

2.    **ADJUSTMENTS** (U.S.S.G. ch. 3, pts. A, B, C)

| Guideline Section | Description | Levels |
|---|---|---|
| § 2F1.1(b)(2) | More than Minimal Planning | 2 |
| § 2F1.1(b)(6) | Sophisticated Means | 2 |
| § 3B1.3 | Abuse of Special Skill | 2 |
| | | |

3.    **ADJUSTED OFFENSE LEVEL**

Enter the sum of the offense levels entered in Items 1 and 2.  If this Worksheet A does not cover every count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction), complete one or more additional Worksheets A and a single Worksheet B.

**26**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*If this is the only Worksheet A, check this box and skip Worksheet B.*

*If the defendant has no criminal history, check this box and skip Worksheet C.*

(rev. 06/99)

15

# WORKSHEET A   (Offense Levels)

| | | | |
|---|---|---|---|
| Defendant: | Jerome J. Allen | Count(s): | One - Dual Object Conspiracy |
| Docket No.: | | Statute(s): | 18 U.S.C. § 371 |

Complete one Worksheet A for each count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction) before applying the multiple-count rules in U.S.S.G. ch. 3, pt. D. However, in any case involving multiple counts of conviction, if the counts of conviction are all "closely related" to each other within the meaning of U.S.S.G. § 3D1.2(d), complete only a single Worksheet A.

## 1. BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS (U.S.S.G. ch. 2)

| Guideline Section | Description | Levels |
|---|---|---|
| § 2T1.1(a)(1) | Conspiracy to File False Tax Returns  (Tax Fraud Object) | |
| § 2T4.1 | Total Tax Loss between $1,500,000 and $2,500,000 (Including Relevant Conduct) | 20 |
| | | |

## 2. ADJUSTMENTS (U.S.S.G. ch. 3, pts. A, B, C)

| Guideline Section | Description | Levels |
|---|---|---|
| § 2T1.1(b)(1) | Failure to Report $10,000 from Criminal Activity | 2 |
| § 2T1.1(b)(2) | Sophisticated Concealment | 2 |
| § 3B1.3 | Abuse of Special Skill | 2 |
| | | |

## 3. ADJUSTED OFFENSE LEVEL

Enter the sum of the offense levels entered in Items 1 and 2.  If this Worksheet A does not cover every count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction), complete one or more additional Worksheets A and a single Worksheet B.

**26**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*If this is the only Worksheet A, check this box and skip Worksheet B.*  ☐

*If the defendant has no criminal history, check this box and skip Worksheet C.*  ☒

(rev. 06/99)

16

## WORKSHEET B   (Multiple Counts)

Instructions (U.S.S.G. ch. 3, pt. D):

- Group the counts of conviction into distinct Groups of Closely Related Counts. "All counts involving substantially the same harm shall be grouped together into a single Group."  (See U.S.S.G. § 3D1.2.)

- Determine the offense level applicable to each Group.  (See U.S.S.G. § 3D1.3.)

- Determine the combined offense level by assigning "units" to each Group as follows (see U.S.S.G. § 3D1.4):

  - assign 1 unit to the Group with the highest offense level,
  - assign 1 unit to each additional Group that is equally serious as, or 1 to 4 levels less serious than, the Group with the highest offense level,
  - assign ½ unit to each Group that is 5 to 8 levels less serious than the Group with the highest offense level,
  - assign no units to each Group that is 9 or more levels less serious than the Group with the highest offense level.

1. GROUP ONE:  COUNT ONE - MAIL FRAUD OBJECT
   ADJUSTED OFFENSE LEVEL                         | 26 |      | 1 unit |

2. GROUP TWO:  COUNT ONE - TAX FRAUD OBJECT
   ADJUSTED OFFENSE LEVEL                          | 26 |     | 1 unit |

3. GROUP THREE:  COUNTS _____
   ADJUSTED OFFENSE LEVEL                          | | | unit |

4. GROUP FOUR:  COUNTS _____
   ADJUSTED OFFENSE LEVEL                          | | | unit |

5. TOTAL UNITS                                      | units |

6. INCREASE IN OFFENSE LEVEL

   1 unit → no increase            2½-3 units → add 3 levels
   1½ units → add 1 level          3½ -5 units → add 4 levels
   2 units → add 2 levels          >5 levels → add 5 levels

   | 2 |

7. ADJUSTED OFFENSE LEVEL OF GROUP
   WITH THE HIGHEST OFFENSE LEVEL                   | 26 |

8. COMBINED ADJUSTED OFFENSE LEVEL

   Enter the sum of the offense levels entered in Items 6 and 7.          | 28 |

17

## WORKSHEET C   (Criminal History)

Date of defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses): _____

1.   PRIOR SENTENCES

   Prior Sentence of Imprisonment Exceeding 13 Months  (U.S.S.G. §§ 4A1.1(a)):           3 POINTS

   Enter 3 points for each prior adult sentence of imprisonment exceeding one year and one month that either (1) was imposed within 15 years of the defendant's commencement of the instant offenses (taking into account relevant conduct and stipulated offenses) or (2) resulted in the defendant's confinement during any part of that 15-year period.  (See U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1), (e)(1).)

   Prior Sentence of Imprisonment of at Least 60 Days  (U.S.S.G. §§ 4A1.1(b)):           2 POINTS

   Enter 2 points for each prior sentence of imprisonment of at least 60 days not counted under U.S.S.G. § 4A1.1(a) that either (1) resulted from an offense committed after the defendant turned 18 and was imposed within 10 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(b), 4A1.2(e)(2)) or (2) resulted from an offense committed before the defendant turned 18 and resulted in the defendant's confinement during any part of the 5-year period preceding the defendant's commencement of the instant offense (see U.S.S.G. §§ 4A1.1(b), 4A1.2(d)(2)(A)).

   Other Prior Sentences  (U.S.S.G. §§ 4A1.1(c)):           1 POINT

   Enter 1 point for each prior sentence not counted under U.S.S.G. § 4A1.1(a) or (b) that either (1) resulted from an offense committed after the defendant turned 18 and was imposed within 10 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2)) or (2) resulted from an offense committed before the defendant turned 18 and was imposed within 5 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(c), 4A1.2(d)(2)(B)).  NOTE:  No more than 4 points may be added under this item.

| Date of Imposition | Status* | Offense | Sentence | Release Date** | Points |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |  |
| _____ | _____ | _____ | _____ | _____ |  |
| _____ | _____ | _____ | _____ | _____ |  |

   •   If the defendant committed the offense before turning 18, indicate whether he or she was sentenced as a juvenile (J) or as an adult (A).

   ••   A release date is required in only three situations:  (1) when a sentence covered under U.S.S.G. § 4A1.1(a) was imposed more than 15 years before the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) but resulted in his or her confinement during any part of that 15-year period; (2) when a sentence counted under U.S.S.G. § 4A1.1(b) was imposed for an offense com-mitted before the defendant turned 18 but resulted in his or her confinement during any part of the 5-year period preceding his or her commence-ment of the instant offense (taking into account relevant conduct and stipulated offenses); and (3) when 2 criminal history points are added pur-suant to U.S.S.G. § 4A1.1(e) because the defendant committed the instant offense (taking into account relevant conduct and stipulated offenses) shortly after or during imprisonment resulting from a sentence counted under U.S.S.G. § 4A1.1(a) or (b) or while he or she was on escape status for such a sentence.  (rev. 06/99)

(WORKSHEET C, p. 2)

2. **COMMISSION OF INSTANT OFFENSE WHILE UNDER PRIOR SENTENCE (U.S.S.G. § 4A1.1(d))**

Enter 2 points if the defendant committed any part of the instant offense (taking into account relevant conduct and stipulated offenses) while under any criminal justice sentence having a custodial or supervisory component, including probation, parole, supervised release, imprisonment, work release, and escape status. (*See* U.S.S.G. §§ 4A1.1(d), 4A1.2(m), (n).) List the type of control and identify the sentence from which it resulted.

_____   ☐

3. **COMMISSION OF INSTANT OFFENSE SHORTLY AFTER OR DURING IMPRISONMENT (U.S.S.G. § 4A1.1(e))**

Enter 2 points if the defendant committed any part of the instant offense (taking into account relevant conduct and stipulated offenses) either less than 2 years after release from imprisonment on a sentence counted under U.S.S.G. §§ 4A1.1(a) or 4A1.1(b) or while in imprisonment or escape status on such a sentence. However enter, only 1 point for this item if 2 points were added under Item 2. (*See* U.S.S.G. §§ 4A1.1(e), 4A1.2(n).) List the date of release and identify the sentence from which it resulted.

_____   ☐

4. **PRIOR SENTENCE RESULTING FROM CRIME OF VIOLENCE (U.S.S.G. § 4A1.1(f))**

Enter 1 point for each prior sentence resulting from a conviction for a crime of violence that did not receive any points under U.S.S.G. § 4A1.1(a), (b), or (c) because such sentence was considered related to another sentence resulting from a conviction for a crime of violence. But enter no points where the sentences are considered related because the offenses occurred on the same occasion. (*See* U.S.S.G. §§ 4A1.1(f), 4A1.2(p).) Identify the crimes of violence and briefly explain why the cases are considered related. NOTE: No more than 3 points may be added under this item.

_____   ☐

5. **TOTAL CRIMINAL HISTORY POINTS**

Enter the sum of the criminal history points entered in Items 1-4.   ☐

6. **CRIMINAL HISTORY CATEGORY**

| Total Criminal History Points | Criminal History Category |
|---|---|
| 0 – 1 | I |
| 2 – 3 | II |
| 4 – 6 | III |
| 7 – 9 | IV |
| 10 – 12 | V |
| ≥ 13 | VI |

☐ I

(rev. 06/99)

19

## WORKSHEET D   (Guideline Range)

**1.**   (COMBINED) ADJUSTED OFFENSE LEVEL

| 28 |
|---|

Enter the adjusted offense level entered in Item 3 of Worksheet A or the combined adjusted offense level entered in Item 8 of Worksheet B.

**2.**   ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY   (U.S.S.G § 3E1.1)

| 3 |
|---|

**3.**   TOTAL OFFENSE LEVEL

| 25 |
|---|

Enter the difference between Items 1 and 2.

**4.**   CRIMINAL HISTORY CATEGORY

| I |
|---|

Enter "I" if the defendant has no criminal history.  Otherwise, enter the criminal history category entered in Item 6 of Worksheet C.

**5.**   CAREER OFFENDER / CRIMINAL LIVELIHOOD / ARMED CAREER CRIMINAL
(U.S.S.G. ch. 4, pt. B)

a.   Total Offense Level:  If the career offender provision (U.S.S.G. § 4B1.1), the criminal livelihood provision (U.S.S.G. § 4B1.3), or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a total offense level higher than the total offense level entered in Item 3, enter the higher offense level total.

b.   Criminal History Category:  If the career offender provision (U.S.S.G. § 4B1.1) or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a criminal history category higher than the criminal history category entered in Item 4, enter the higher criminal history category.

**6.**   GUIDELINE RANGE FROM SENTENCING TABLE   (U.S.S.G. ch. 5, pt. A)

| 57-71 months |
|---|

Enter the guideline range in the Sentencing Table (see U.S.S.G. ch. 5, pt. A) produced by the total offense level entered in Item 3 or 5.a and the criminal history category entered in Item 4 or 5.b.

**7.**   STATUTORY RESTRICTIONS ON OR SUPERSESSION OF GUIDELINE RANGE

| months |
|---|

If the maximum sentence authorized by statute is below, or a minimum sentence required by statute is above, the guideline range entered in Item 6, enter either the guideline range as restricted by statute or the sentence required by statute.  (See U.S.S.G. § 5G1.1.)  If the sentence on any count of conviction is required by statute to be consecutive to the sentence on any other count of conviction, explain why.

(rev. 96/99)

20

## WORKSHEET E   (Authorized Guideline Sentences)

1.  **PROBATION** (U.S.S.G. ch. 5, pt. B)

    a.  Imposition of a Term of Probation  (U.S.S.G. § 5B1.1)

    ☐   1.  If this box is checked, go to Item 2 (Split Sentence).

    ☐   2.  Probation is authorized by the guidelines (minimum of guideline range = zero months).

    ☐   3.  Probation is authorized by the guidelines, provided the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention satisfying the minimum of the guideline range (minimum of guideline range > 0 months but ≤ 6 months).

    b.  Length of Term of Probation  (U.S.S.G. § 5B1.2)

    ☐   1.  At least 1 year but not more than 5 years (total offense level  ≥ 6).

    ☐   2.  No more than 3 years (total offense level < 6).

    c.  Conditions of Probation  (U.S.S.G. § 5B1.3)

    The court must impose certain conditions of probation and may impose other conditions of probation.

2.  **SPLIT SENTENCE** (U.S.S.G. § 5C1.1(c)(2), (d)(2))

    ☒   a.  A split sentence is not authorized (minimum of guideline range = 0 months or > 10 months).

    ☐   b.  A split sentence is authorized (minimum of guideline range > 0 months but ≤ 10 months). The court may impose a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for imprisonment, provided that at least one-half of the minimum of the guideline range is satisfied by imprisonment (if the minimum of the guideline range is 8, 9, or 10 months), or that at least one month is satisfied by imprisonment (if the minimum of the guideline range is 1, 2, 3, 4, or 6 months). The authorized length of the term of supervised release is set forth below in Item 4.b

3.  **IMPRISONMENT** (U.S.S.G. ch. 5, pt. C)

    A term of imprisonment is authorized by the guidelines if it is within the applicable guideline range (entered in Item 6 of Worksheet D).  (See U.S.S.G. § 5C1.1.)                    (rev. 06/99)

(WORKSHEET E, p. 2)

4.   SUPERVISED RELEASE  (U.S.S.G. ch 5., pt. D)

    a.   Imposition of a Term of Supervised Release  (U.S.S.G. § 5D1.1)

        The court must impose a term of supervised release if it imposes a term of imprisonment of more than one year, or if it is required to do so by statute.  The court may impose a term of supervised release if it imposes a term of imprisonment of one year or less.

    b.   Length of Term of Supervised Release  (U.S.S.G. § 5D1.2)

      ☐   1.   At least 3 years but not more than 5 years, where the count of conviction is a Class A or a Class B felony, i.e., an offense carrying a maximum term of imprisonment ≥ 25 years.

      ☒   2.   At least 2 years but not more than 3 years, where the count of conviction is a Class C or a Class D felony, i.e., an offense carrying a maximum term of imprisonment ≥ 5 years but < 25 years.

      ☐   3.   1 year, where the count of conviction is a Class E felony or a Class A misdemeanor, i.e., an offense carrying a maximum term of imprisonment > 6 months but < 5 years.

      ☐   4.   The statute of conviction requires a minimum term of supervised release of _____ months.

    c.   Conditions of Supervised Release  (U.S.S.G. § 5D1.3)

        The court must impose certain conditions of supervised release and may impose other conditions of supervised release.

5.   RESTITUTION (U.S.S.G. § 5E1.1)

    ☐   1.   The court will determine whether restitution should be ordered and in what amount.

    ☒   2.   Full restitution to the victim(s) of the offense(s) of conviction is *required* by statute.  (*See, e.g.*, 18 U.S.C. §§ 3663A, 2327.)  The parties agree that full restitution is $ 6,583,072.80.

    ☐   3.   The parties agree that the court may order restitution to the victim(s) of the offense(s) of conviction in any amount up to and including $_____.  (*See* 18 U.S.C. §§ 3663(a)(3).)

    ☐   4.   The parties agree that the court may *also* order restitution to persons other than the victim(s) of the offense(s) of conviction.  (*See* 18 U.S.C. §§ 3663(a)(1)(A), 3663A(a)(3).)

    ☐   5.   Restitution is not applicable.

(rev. 06/99)

22

(WORKSHEET E, p. 3)

6.   FINE (U.S.S.G. § 5E1.2)

   a. Fines for Individual Defendants

   The court must impose a fine unless "the defendant establishes that he [or she] is unable to pay and is not likely to become able to pay any fine." (See U.S.S.G. § 5E1.2(a).)  Generally, the fine authorized by the guidelines is limited to the range established in the Fine Table. (See U.S.S.G. § 5E1.2(b).)  However, there are exceptions to this general rule. (See U.S.S.G. § 5E1.2(b), (c)(4).)

   b. Fine Range from Fine Table (U.S.S.G. § 5E1.2(c)(3))

            Minimum Fine                Maximum Fine

            $ 10,000                    $ 100,000

7.   SPECIAL ASSESSMENT(S) (U.S.S.G. § 5E1.3)

   The court must impose a special assessment on every count of conviction.  The special assessments for individual defendants are

        $100.00 for every count charging a felony ($50.00 if the offense was completed before April 24, 1996)
        $ 25.00 for every count charging a Class A misdemeanor,
        $ 10.00 for every count charging a Class B misdemeanor, and
        $  5.00 for every count charging a Class C misdemeanor or an infraction.

   The defendant must pay a special assessment or special assessments in the total amount of $ 100 .

8.   ADDITIONAL APPLICABLE GUIDELINES, POLICY STATEMENTS, AND STATUTES

   List any additional applicable guideline, policy statement, or statute.

9.   UPWARD OR DOWNWARD DEPARTURE (U.S.S.G. ch. 5, pts. H & K)

   List any applicable aggravating or mitigating circumstance that might support a term of imprisonment above or below the applicable guideline range.

        Upon the government's determination that defendant's cooperation amounts to substantial

   assistance, the government may file a motion for downward departure pursuant to §5K1.1.      (rev. 06/99)

23



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

    v.

D-1 KENNETH J. GRAHAM, 80504 *git*
D-2 KYLE E. DRESBACH, 80504 *git*

       Defendants.

CRIMINAL NO. 03-80504

HON. ARTHUR J. TARNOW

VIOLATIONS:  18 U.S.C. § 371
           18 U.S.C. § 982
           18 U.S.C. § 1956
           18 U.S.C. §§ 1957, 2
           26 U.S.C. § 7206(1)

MAGISTRATE JUDGE CARLSON

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### COUNT ONE
(18 U.S.C. § 371 - Conspiracy)

**D-1 KENNETH J. GRAHAM**
**D-2 KYLE E. DRESBACH**

### PARTIES, PERSONS AND ENTITIES

At all times relevant to this Indictment, unless otherwise indicated:

1.     Thyssen, Inc., N.A. ("Thyssen") was a corporation headquartered in Detroit, Michigan, was engaged in the business of providing steel to the automotive industry, and, as of October 1, 1998, was a subsidiary of ThyssenKrupp AG, a German corporation. During the years 1991 through 2000, Thyssen expanded its operations by constructing various steel processing plants ("the construction projects"), including the construction of a plant in Detroit, Michigan, and the construction of a plant in Richburg, South Carolina.